IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NEA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:25-CV-7-KFP |
| | ) | |
| TRUSTMARK NATIONAL BANK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This is an employment discrimination case rooted in Plaintiff Nea Jones's separation from employment with Defendant Trustmark National Bank. Jones alleges failure to accommodate, discrimination, and retaliation in violation of the Americans with Disabilities Act (ADA) and retaliation and interference in violation of the Family Medical Leave Act (FMLA). Doc. 1.

The parties consented to a United States Magistrate Judge conducting all proceedings in this case through final judgment. Doc. 11. Before the Court is Trustmark's Motion for Summary Judgment. Doc. 31. Upon consideration of the motion, supporting memorandum (Doc. 32), Jones's response (Doc. 37), Trustmark's reply (Doc. 39), and the parties' evidentiary submissions (Docs. 31, 36, 38), the Court finds Trustmark's Motion for Summary Judgment is due to be granted.

## I.    SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party . . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for "summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The relevant rules of substantive law dictate the materiality of a disputed fact." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). In determining whether a genuine dispute of fact for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the

2

evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam); *see also* Fed. R. Civ. P. 56(a).

To survive a properly supported motion for summary judgment, a plaintiff must produce some evidence supporting her claims. *See Celotex Corp.*, 477 U.S. at 322. He must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. A plaintiff's conclusory allegations do not provide sufficient evidence to oppose a motion for summary judgment. *See Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (per curiam); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984). Consequently, when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [his] case" on which he will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 322–23. Where all the evidentiary materials before the court indicate that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, the entry of summary judgment is proper. *Id.* at 322; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48 (emphasis omitted)). Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## II.    JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Personal jurisdiction and venue are not contested, and the Court concludes that venue properly lies in the Middle District of Alabama. 28 U.S.C. § 1391.

## III.    BACKGROUND[1]

### A.    Jones's Employment and FMLA Leave

Trustmark hired Jones as a Community Banking Assistant II on August 1, 2023. Doc. 31-1 at 2; Doc. 31-4 at 229:1–4. Prior to employment with Trustmark, Jones served in a fully remote position at Hancock Whitney Bank. *Id.* at 11:17–12:7, 24:18–25:20. In her position with Trustmark, she worked in person in Trustmark's downtown Montgomery office location. Doc. 31-1 at 2.

Jones's role was to assist the business banking and lending supervisors within her department. Doc. 31-3 at 24:14–23. Her responsibilities included assisting her supervisor, Roger Teel,[2] and Todd Etheridge[3] with portfolio management and maintenance, preparing loan documents, customer service, new loan requests, and reporting. Doc. 31-2; Doc. 31-3 at 25:1–26:21, 33:12–34:15. At times during Jones's employment, Etheredge would assign work directly to Jones. Doc. 31-24 ¶ 2. Jones also received additional assignments

---

[1] The Court presents only those facts pertinent to resolving the Motion for Summary Judgment. "[T]he facts at this stage are what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party who was opposing summary judgment[.]" *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020).

[2] Teel is the Vice President of Commercial and Business Banking at Trustmark. Doc. 31-1 at 2; Doc. 31-3 at 15:8–16:18, 17:16–18:10.

[3] Etheredge is Teel's direct supervisor. Doc. 31-3 at 19:13; Doc. 31-24 ¶ 2.

involving loan file processing and other supportive projects that were assigned by lenders Butch Driver and Jason Kocher. *Id.* ¶ 3; Doc. 31-3 at 24:14–23.

In early 2024, Jones had to take personal leave for a series of family and medical emergencies. Doc. 31-4 at 135:15–138:18, 139:20–144:15; Doc. 31-1 at 8. At this point, she was not yet eligible for FMLA leave. *See* Doc. 31-3 at 57:1–7; Doc. 31-4 at 135:6–14; Doc. 31-5 at 1. Her eligibility would begin in August 2024: the one-year anniversary of her employment with Trustmark. *See* Doc. 31-3 at 57:1–7; Doc. 31-4 at 135:6–14; Doc. 31-5 at 1. To accommodate Jones's need to be out of the office during this time, Trustmark allowed her to work from home full-time for a specific time frame and to use sick days and vacation time. Doc. 31-4 at 135:15–144:15; Doc. 31-5.

In June 2024, Jones was diagnosed with breast cancer. Doc. 31-1 at 4; Doc. 31-6 at 1. She shared this cancer diagnosis with Teel, and Teel shared her diagnosis with Etheredge and Human Resources. Doc. 31-3 at 52:1–15; Doc. 31-4 at 39:13–40:20. After her diagnosis, from June 11, 2024, through August 1, 2024, she remained in-office and worked in-office unless she needed to be out of the office for an appointment. *Id.* at 167:2–10.

On July 25, 2024, Jones submitted a request for FMLA leave beginning August 1, 2024, through October 8, 2024, for chemotherapy treatments. Doc. 31-7; Doc. 31-4 at 167:11–14. Subsequently, she also requested intermittent FMLA leave for October 8, 2024, through February 6, 2025. Doc. 31-12. Jones's leave was approved, and she was given FMLA leave for the requested time frame in August through September 2024, and intermittent leave for her surgery scheduled in November 2024. Doc. 31-10; 31-12; 31-31; 31-32. While on leave, Teel communicated with Jones over text. Doc. 31-4 at 58:14–60:1,

164:6–166:18; Doc. 31-26. At one point, there was a five-minute phone call between Jones, Teel, and Etheredge discussing when she planned to return to work, "how [her] treatments were going, what [her] symptoms were, [and] how [she] was feeling." Doc. 31-4 at 59:1–60:1, 262:20–263:23; *see* Doc. 31-3 at 110:1–113:22; Doc. 31-26 (showing text messages between Teel and Jones); Doc. 36-4 at 42:1–43:12.

## B.    Jones's Return to Work and Hybrid Work Request

While on FMLA leave, in mid-September 2024, Jones decided to return to work early.[4] Doc. 31-13 at 1. On September 16, 2024, Jones sent an email to Ivana Hughes in Trustmark's HR Compliance asking whether she could "return[] to work if possible next week and work[] around my remaining treatment schedule and upcoming dr. appointments[] and also . . . see if a hybrid work schedule could be offered for a couple days of the week." *Id.*; Doc. 31-4 at 167:18–168:25. In the email she relayed that she "still [has] days where [she was] not feeling as well but the bad days have not outweighed the good and [she] fe[lt] like [she was] able to complete [her] daily tasks as [she] did prior to [her] leave[.]" Doc. 31-13. In response, Jones was told to "provide updated documentation from [her] physician" and "HR Compliance [would] review and see about making accommodations/adjustments." *Id.*; *see also* Doc. 31-4 at 169:1–170:14. Jones's physician did not recommend her returning to work prior to October 1, 2024, so on September 30,

---

[4] Jones acknowledged through mid-September, she was still receiving regular pay while on unpaid FMLA leave because she had vacation and sick time that could be applied to her time out-of-office. Doc. 31-4 at 107:6–108:25, 168:13–25. When the sick and vacation leave ran out, she sought to return to work because she didn't have anyone else to support her financially. Doc. 31-4 at 108:12–109:10. The last half of September she was on unpaid FMLA leave. Doc. 31-4 at 107:23–108:11, 168:13–25.

2024, Jones's physician provided her with the requested documentation. *Id.* at 171:6–172:15.

Upon Jones's return to work on October 1, 2024, (Doc. 31-4 at 77:11–79:11), her physician submitted Jones's "Certification of Health Care Provider" (Doc. 31-23 ¶ 2; Doc. 31-4 at 73:6–75:22, 170:15–171:5; Doc. 31-14). The Certification, dated September 30, 2024, released Jones to work, but included the restriction: "Patient may be unable to stand[5] for prolonged periods without a break due to current treatment plan. Please allow [Patient] to work a hybrid schedule if possible to accommodate current symptoms and condition." Doc. 31-23 ¶ 2; *see* Doc. 31-4 at 73:6–75:22; Doc. 31-14 at 5. Jones indicated she sought a hybrid schedule where she could "perform [her] normal tasks from [her] home . . . [o]ne day a week." Doc. 31-4 at 76:10–15.

It was Trustmark's practice that "the interactive process between the HR Compliance Manager and the associate or applicant should begin within a reasonable time period upon receipt of the [accommodation] request by the HR Compliance Manager," and normally this begins "within two . . . business days of receipt of the request in HR Compliance." Doc. 31-15 at 6. This process is described as a means "to determine what, if any accommodation should be provided or how Trustmark and the associate or applicant can best resolve the request." *Id.*

Alexandria Smith, an HR Compliance Specialist, was responsible for reviewing Jones's accommodation request. Doc. 31-23 ¶ 3. On October 2, 2024, Smith informed

---

[5] Jones acknowledged that the standing restriction was not an issue with her job because her job required her to sit at a desk. Doc. 31-4 at 75:12–76:9.

7

Jones that her physician's request was missing a "return-to-work date" and her physician would need to include the date in order for the request to be processed. *Id.* On the same date, the Montgomery Cancer Center faxed an updated certification providing the October 1, 2024, return-to-work date. *Id.* Smith then initiated correspondence with the Employee Relations Manager, Vincent Gatlin, concerning Jones's reasonable accommodation request for a hybrid work situation. Doc. 31-16 at 4–5. Gatlin recommended Smith "reach[] out to [Jones's] manager and discuss[] what a hybrid work schedule would look like for [Jones]," and noted that "[t]he company's current policy is that an associate can work a 3/2 schedule. Also, you may want to check with the team and see how we handled similar requests in the past." *Id.* at 4.

Smith then reached out to Teel and informed him that she would "be initiating the Remote Work—Accommodations Request for associate Nea Jones." *Id.* at 3. She described that Jones "already submitted the medical documentation required from a physician; however, [she would]' need to collect information from [Teel] concerning how [the] department/location manages remote work before an official determination can be made." *Id.* Teel responded to Smith's email and explained how his department manages remote work and recalled Jones "worked remotely from her home back in February, 2024." *Id.* at 1; Doc. 31-23 ¶ 5. He said that during that time, she was provided with a laptop and they coordinated work assignments remotely. Doc. 31-16 at 1; Doc. 31-23 ¶ 5. Both Etheredge[6]

---

[6] Etheredge recalled learning of her request for the accommodation, and he discussed it with Teel; Etheredge "thought that we should be able to accommodate it." Doc. 36-4 at 44:22-46:9.

and Teel communicated to HR they "were fine with accommodating her request to work from home." Doc. 31-3 at 63:10–12. Teel emphasized "we had absolutely no problem whatsoever with her working from home, but I don't recall if it was hybrid or every day." *Id.* at 62:2–5.

On Friday, October 4, 2024, Teel and Smith scheduled[7] a virtual call to discuss the remote work request and invited Jones to sit in on the call. Doc. 31-16 at 1–2; Doc. 31-3 at 57:8–62:10; Doc. 31-23 ¶ 6; Doc. 31-4 at 70:1–15. During the phone call, Jones and Teel were on speaker phone in his office. Doc. 31-23 ¶ 6; Doc. 31-4 at 70:2–22. During the meeting, Jones withdrew the request for a hybrid schedule.[8] Doc. 31-4 at 71:1–6, 83:15–85:7, 176:4–19; Doc. 31-23 ¶ 6. In one instance, Jones claims she said to Teel, "[I]f it's going to be a problem with me being able to work from home on an as needed basis, I can have my doctor just remove the accommodations. He then just said okay." Doc. 31-4 at

---

[7] Between October 2, 2024, and October 4, 2024, Teel and Smith exchanged a series of emails and voicemails in an attempt to schedule a meeting to discuss the request. Doc. 31-23 ¶ 5.

[8] Smith and Jones agree it was during this phone call that Jones rescinded her accommodation request.

In her Declaration, Smith recounts "[d]uring the discussion, Jones . . . stated that she was no longer interested in the hybrid work accommodation." Doc. 31-23 ¶ 6. Smith claimed she "did not hear Teel say anything during the conversation that would have prompted this statement from Jones." Doc. 31-23 ¶ 6.

Teel's recollection is that "Nea decided against working from home, and she approached both [Etheredge] and [Teel] and said that she actually would prefer to work from the office." Doc. 31-3 at 62:8–18, 70:4–76:9. Finally, Etheredge presents a fourth perspective, that he does not recall Nea or Teel discussing removing the accommodation, (Doc. 36-4 at 47:13–49:5), and "[n]o one discussed [removing the accommodation request] with [Etheredge] but [he] found out that it was removed" and that she "was coming back full-time." Doc. 36-4 at 47:13–48:6.

For purposes of summary judgment, the Court views this evidence in favor of the nonmoving party and operates under the assumption that Jones made a statement rescinding her request during this phone call. *See Guidry v. Comey*, 692 F. App'x 975, 977 (11th Cir. 2017) (per curiam) ("[T]he evidence [is] viewed in the light most favorable to the nonmoving party[.]").

70:12–71:14. Jones also testified "[a]fter I explained to Teel why I needed the accommodation, he paused for what I estimate to be about 30 seconds. When I said to Teel that I could remove the accommodation if it was going to be a problem, he responded instantly, saying 'Okay,' and reiterated to Smith, who was on the phone, 'did you hear that?'" Doc. 36-1 ¶¶ 3, 4.[9] Jones claims Teel's "tone" when Teel asked a "question" made her feel "bullied" into removing the accommodation request. Doc. 31-1 at 9–10; Doc. 31-4 at 173:23–176:19.

Smith told Jones "she would need to obtain updated documentation from her physician releasing her to return to work without restrictions" because the "current documentation [they] had from her physician included the hybrid work requirement." Doc. 31-23 ¶ 7; Doc. 31-4 at 71:6–72:9. On October 8, 2024, the Montgomery Cancer Center submitted new documentation "releas[ing] Jones to return to work without restrictions." Doc. 31-23 ¶ 8; Doc. 31-17; Doc. 31-4 at 79:13–83:14. Jones appeared to work in-person to carry out her responsibilities. *Id.* at 176:20–177:5.

### C.    Jones's Workplace Interactions

Jones alleges after her diagnosis in June, her "interactions with [Teel] and other colleagues changed noticeably." Doc. 1 ¶ 15. Jones expressed that after her diagnosis, her coworkers "didn't speak to [her] when they came into the office" and she "started to feel isolated from [her] peers" and "unwanted." Doc. 31-4 at 45:16–25. Jones claims that a coworker "overheard" others "discussing [Jones's] . . . medical condition." Doc. 31-4 at

---

[9] In her declaration, Jones claims that during the phone call, she "observed Teel muting and unmuting the phone throughout the duration of the meeting." Doc. 36-1 ¶ 2.

57:13–58:13; Doc. 31-21. She also described a coworker who came "to [her] desk and . . . explained . . . that his wife had gone through . . . breast cancer," and told Jones "to hang in there." Doc. 31-4 at 191:4–11. According to Jones, Teel relayed to Jones that Etheredge's "sister had gone through breast cancer," and that his "sister continued to work throughout her treatments and she was fine and he thinks that [Jones would] be fine[.]" Doc. 31-4 at 41:15–23; *see also* Doc. 36-4 at 39:12–41:4.

### D.    Jones's Amount of Work and Performance

Between the months of June and October 2024, out of the seven loans that Teel worked on during that time frame, Jones was assigned six of those loans to work on. Doc. 31-3 at 37:13–40:16. Teel explained that during those months, "it was really slow." *Id.* at 37:13–40:16. Jones claims that "when [she] returned from FMLA, [her] assignments had been completely cut[.]" Doc. 31-4 at 88:10–15. She further acknowledged that before her FMLA leave there were assignments she was working on, but that "as far as new loans coming in, they decreased." *Id.* at 88:10–15. She claims a coworker, Driver, "no longer wanted [her] to deal with his clients" and Teel "stopped giving [her] assignments," and responding to her emails. Doc. 1 ¶¶ 16–18.

Trustmark's loan data is contained in the nCino software system. Doc. 31-24 ¶ 4. This data involves information about "loans Trustmark makes and services" and "establishes that Teel, Driver, and Kocher continued to follow the same practices regarding the assignment of loans to assistants after Jones's diagnosis in June 2024 that they followed prior to her diagnosis." *Id.* ¶ 4.

11

Jones had a quarterly performance review on October 29, 2024. Doc. 31-3 at 94:1–16; Doc. 31-21; Doc. 31-22. Teel indicated he had no worries or questions about Jones's job performance, and he was pleased with her work; Jones also agreed that the evaluation was positive. Doc. 31-3 at 56:10–15, 94:1–96:2; Doc. 31-4 at 94:22–95:2. Teel reflects that during the meeting he told Jones, "I hope you don't regret coming to work for Trustmark, and I say that because you have become really isolated and quiet, and I'm concerned about your behavior." Doc. 31-3 at 98:6–10. Elsewhere, Jones acknowledged that after her diagnosis, she "started to feel isolated from [her] peers" and "unwanted there." Doc. 31-4 at 44:19–45:23. Jones claimed in her resignation letter she did "not feel that [her] presence is needed and that was made very clear on Tuesday when [she] had [her] quarterly meeting with . . . [Teel]." Doc. 31-21 at 1. The letter continues that during the evaluation, Teel expressed that "due to [her] treatments and medical appointments . . . a work from home job would be more suitable." *Id.* She claims that Teel "wanted to know if [she] felt like this was the job for [her]" and asked "don't you think that it would be better if you find a job working remotely?" Doc. 31-4 at 94:6–12.[10] The notes from Jones's quarterly performance review include comments from Teel such as "Nea told me she has all the tools necessary to be successful," and he "will try to be cognizant" of Jones's claim that "there are times that she is dependent upon other TRMK associates when I assign certain tasks for her to complete." Doc. 31-22. The evaluation includes Jones's note concluding "we agree with

---

[10] Teel testified that he never told Jones that her current position was not suitable for her due to her cancer treatments. Doc. 31-3 at 96:3–23. For purposes of summary judgment, the Court views this evidence in favor of the nonmoving party. *See Guidry*, 692 F. App'x at 977 ("[T]he evidence [is] viewed in the light most favorable to the nonmoving party[.]").

12

the feedback and will move forward with implementing the suggestions made moving forward." *Id.*

Jones acknowledged at the time of her resignation she still had a job at Trustmark and had not received any sort of discipline. Doc. 31-4 at 105:2–15.

### E.    Jones's Former Employment and Ongoing Job Search

Prior to Jones's employment with Trustmark, Jones was employed by Hancock Whitney in a fully remote position. Doc. 31-4 at 11:17–12:7, 24:18–25:20. Soon after Jones left Hancock and began working at Trustmark in August 2023, she applied to four different positions at Hancock between October 2023 and August 2024. Doc. 31-4 at 229:1–17, 233:24–234:14, 236:1–9, 252:13–22.

On August 22, 2024, Jones applied to a Documentation Specialist role at Hancock. *Id.* at 233:24–234:14; Doc. 31-18. Jones interviewed for this position on August 30, 2024. *Id.* Ultimately, on October 30, 2024, Hancock offered Jones the job, and she accepted the offer on the same date (and the day after her performance review). Doc. 31-4 at 233:24–235:25, 238:8–18; Doc. 31-20.

Jones acknowledged she "applied for the job with Hancock mainly based on it being remote which would benefit me going through the rest of my chemo and my surgery that was scheduled." *Id.* at 252:18–22. During Jones's interview with Hancock on August 30, 2024, when asked about why she was leaving Trustmark, she said that she was "wanting a change." Doc. 31-18 at 2.

Separately from her application and interview with Hancock in August, after her quarterly performance review on October 29, 2024, Jones applied[11] for a remote job with Trustmark: a Mortgage Loan Closing Specialist I. Doc. 31-4 at 95:3–16. Within minutes of submitting her application, she received an email back telling her she did not qualify for the position. *Id.* at 95:21–96:4. Daisha Sallie was the Talent Acquisition Partner "responsible for reviewing applicants for the position of Mortgage Loan Closing Specialist that was posted by Trustmark internally in 2024," and she reviewed Jones's application. Doc. 31-19 ¶¶ 1, 2. Sallie determined Jones was not qualified and communicated the decision to Jones via email. *Id.* ¶ 3. Sallie affirmed she did not know Jones, never spoke with her, and had no knowledge of her condition, FMLA status, or have any communications with her supervisor Teel. *Id.* ¶ 4. Jones acknowledged she did not have any further discussions about the application process with Teel. Doc. 31-4 at 96:20–97:1.

On October 31, 2024, the day after she accepted the job with Hancock, Jones left her keys on her desk, and the next day, November 1, 2024, she emailed her resignation notice, which was effective immediately. Doc. 31-1 at 2; Doc. 31-20; Doc. 31-21; Doc. 31-4 at 201:25–203:14.

---

[11] Jones stated that during her performance evaluation Teel asked if "you think that it would be better if you find a job working remotely," and in response she "asked him if it was okay if [Jones] applied for an internal position to be able to work remote" and "he recommended that I apply for that position." Doc. 31-4 at 94:1–21.

## IV.    DISCUSSION

Jones alleges six counts against Trustmark.[12] In Count I, Jones alleges Trustmark failed to accommodate her in violation of the ADA. Doc. 1 ¶¶ 44–51. In Count II, Jones asserts she was discriminated against in violation of the ADA when she was forced to resign because of her disability. *Id.* ¶¶ 52–62. In Count III, Jones claims she was retaliated against in violation of the ADA after she requested accommodation for her disability. *Id.* ¶¶ 63–69. In Count IV, Jones alleges FMLA retaliation because she was "constructively discharged." *Id.* ¶¶ 70–79. In Count V, she avers Trustmark interfered with her FMLA rights while she was on leave. *Id.* ¶¶ 80–89.

### A.    Trustmark did not fail to accommodate Jones's disability.

In Count I, Jones alleges Trustmark failed to accommodate her disability. *Id.* ¶¶ 44–51. Specifically, Jones asserts "[Trustmark] failed to engage in the interactive process required by the [ADA], even though [she] was able to perform the essential functions of her job." *Id.* ¶¶ 44–50. In its motion, Trustmark argues Jones's claim fails because (1) she admittedly was able to perform the essential functions of her job without an accommodation, and (2) she was not denied an accommodation. Doc. 32 at 14–15. In

---

[12] In Count VI of the Complaint, Jones alleges Trustmark violated the FLSA. Doc. 1 ¶¶ 91–99. Trustmark argues in its motion Jones (1) "failed to state a claim for violation of the FLSA because she has not alleged that Trustmark failed to pay her wages that were at least equivalent to the federal minimum wage and/or that she was deprived of overtime wages," and (2) "the undisputed evidence establishes that Jones's FLSA claim is based on a fundamental misunderstanding of Trustmark's payroll system, and that Jones was paid in full for all hours worked as a Trustmark employee." Doc. 32 at 17. In response, Jones conceded the claim. Doc. 37 at 20. "Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes abandonment of that claim and warrants the entry of summary judgment for the opposing party." *Carter v. Companion Life Ins. Co.*, 338 F.R.D. 413, 421 (N.D. Ala. 2021) (quoting *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004)). Thus, Trustmark is entitled to summary judgment as to Count VI.

15

opposition, Jones argues that she has demonstrated a genuine dispute of material fact on this issue because (1) "[r]egardless of [her] testimony," she still had to come to work when she was unwell, and (2) Teel's testimony and Plaintiff's testimony differ "as to when the interactive process between Jones and Trustmark broke down." Doc. 37 at 28–32. For the first time in her response, Jones also raises a new argument not in her Complaint and claims Trustmark failed to accommodate her by not reassigning her to the Mortgage Loan Closing Specialist I remote position. *Id.* at 33.

Discrimination under the ADA occurs "when the employer fails to provide reasonable accommodations for the disability—unless doing so would impose undue hardship on the employer." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)). "[F]ailure-to-accommodate plaintiffs must show (1) their employer unlawfully discriminated against them, or, 'failed to reasonably accommodate [their] disability' and (2) this failure led to an 'adverse employment decision.'" *Id.* (second alteration in original) (quoting *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1263 n.17 (11th Cir. 2007)).

"The ADA requires an employer to make 'reasonable accommodations' to an otherwise qualified employee with a disability, 'unless doing so would impose [an] undue hardship.'" *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (alteration in original) (quoting *Lucas*, 257 F.3d at 1255). "An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Id.* Notably, it is the employee's burden to "identify[] an accommodation and demonstrate[e] that it is reasonable." *Id.* "[A]n employer's 'duty to provide a reasonable accommodation

16

is not triggered unless a specific demand for an accommodation has been made.'" *Id.* at 1255–56 (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (per curiam)). Once an employee places a demand for an accommodation, "the employer and employee may conduct 'an informal interactive process' to determine a reasonable accommodation." *Everett v. Grady Mem. Hosp. Corp.*, 703 F. App'x 938, 946 (11th Cir. 2017)[13] (citing 29 C.F.R. § 1630.2(o)(3)). "Under the ADA, an employer will not be liable for failure to accommodate if the employee is responsible for the breakdown of the interactive process." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (citing *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).

### 1.    Jones has not established the accommodation was necessary for performing her essential job functions.

Here, Jones alleges her disability, cancer, was not accommodated, and Trustmark failed to engage in the interactive process. Doc. 1 ¶ 50. Trustmark does not dispute Jones had a disability. Doc. 32. Before reaching the issue of whether Trustmark failed to engage in the interactive process, the Court must confirm whether Jones has met her burden in showing that her accommodation would allow her to perform the essential functions of her job.

"As with the other elements of the prima facie case, it is the plaintiff's burden to establish that [she] could perform the essential functions of the job." *Kendall v. Sec'y, VA*,

---

[13] Here, and elsewhere in this Opinion, the Court cites to non-binding authority. While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

682 F. App'x 761, 765 (11th Cir. 2017) (per curiam) (citing *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000)). "The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow [her] to perform the essential functions of the job in question." *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017). "[I]f an employee does not require an accommodation to perform her essential job functions, then the employer is under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided." *D'Onofrio*, 964 F.3d at 1022.

Jones acknowledges she was able to perform her essential job functions when she returned to work between October 1 and November 1. Doc. 31-4 at 177:1–5. Further, in her response, Jones's only argument in support of her need for a reasonable accommodation is "the record is clear that it harmed Jones to go without the reasonable accommodation of working from home." Doc. 37 at 29–30. This argument ignores the question whether the hybrid schedule request would help her perform the essential functions. *Id.* The record shows Jones went to work in person and even received a positive performance review in the month she was in the office after her FMLA leave. Doc. 31-4 at 176:20–25; Doc. 31-3 at 56:10–15, 94:1–96:2; Doc. 31-22. Further, the evidence confirms she could perform the essential job functions. Jones's email to HR stated that while she "still [has] days where [she was] not feeling as well but the bad days have not outweighed the good and [she] fe[lt] like [she was] able to complete [her] daily tasks as [she] did prior to [her] leave[.]" Doc. 31-13. Jones's physician only requested to "allow [Patient] to work a hybrid schedule if possible to accommodate current symptoms and condition." Doc. 31-

23 ¶ 2; *see* Doc. 31-4 at 74:4–75:22; Doc. 31-14 at 5. Jones's testimony indicates she only sought a hybrid schedule for "[o]ne day a week." Doc. 31-4 at 76:10–15. Nowhere does Jones claim that the standing restriction was an issue with her job. *Id.* at 75:12–76:9. The record also establishes that on October 8, 2024, Jones's physician submitted a new certification noting that "the patient is able to return to work with no restrictions," which effectively removed the hybrid work request altogether. Doc. 31-17; Doc. 31-23 ¶ 8; *see* Doc. 31-4 at 79:13–83:14.

Jones asks the Court to disregard certain aspects of her testimony but consider other aspects of her testimony from her deposition and Declaration. Doc. 37 at 29–30. To that end, Jones cites her deposition testimony and declaration highlighting her immunocompromised health status, her need to take a nap in the car during her lunch break, and her general feeling of unwellness while at work. *Id.* (citing Doc. 31-4 at 75:12–19, 71:15–72:6, 98:1–99:14; Doc. 36-1). While this information certainly shows Jones was enduring the effects of her cancer diagnosis and treatment when she returned from FMLA leave, none of the testimony establishes the accommodation was needed for her perform the essential function of her job. *Boyle*, 866 F.3d at 1289 ("The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question."); *see Moore v. Hillsborough Cnty. Bd.*, 544 F. Supp. 2d 1291, 1305 (M.D. Fla. 2008) (finding that the question of reasonableness does not arise when "Plaintiff admit[ted] that she could perform her job without any accommodation"); *Beatty v. Hudco Indus. Prods., Inc.*, 881 F. Supp. 2d 1344,

1356 (N.D. Ala. 2012) (finding Plaintiff's "claim for reasonable accommodation fails for the simple reason that she did not need an accommodation").

Thus, Jones's evidence does not establish the requested accommodation was necessary "to perform her essential job functions." *D'Onofrio*, 964 F.3d at 1022. For this reason, Trustmark "[was] under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided." *Id.* Thus, summary judgment is due to be awarded as to Count I.

### 2.    Jones caused a breakdown in the interactive process.

Alternatively, even if Jones could not perform the essential function of her job without the reasonable accommodation, Trustmark is not liable for failure to provide an accommodation because Jones caused a breakdown in the interactive process. *See* Doc. 31-4 at 71:1–6 (acknowledging she "can have my doctor just remove the accommodations"); *see also id.* at 83:15–85:6 (acknowledging that neither Teel nor Smith told her that her accommodation was being denied).

As stated above, "an employer will not be liable for failure to accommodate if the employee is responsible for the breakdown of the interactive process." *D'Onofrio*, 964 F.3d at 1022 (citing *Stewart*, 117 F.3d at 1287); *see also Knowles v. Sheriff*, 460 F. App'x 833, 835–36 (11th Cir. 2012) (affirming plaintiff did not meet his burden on the failure to accommodate claim where he "failed to establish" there was a denial of a reasonable accommodation where there was only "evidence of a communication breakdown"). "If the employer engages in an interactive process, the employer will not be liable for failing to accommodate the employee if there is a breakdown in the interactive process not due to

the employer or there is no reasonable way to accommodate the employee." *Laun v. Bd. of Regents*, 2019 U.S. Dist. LEXIS 164517, at *19 (S.D. Ga. Sept. 25, 2019). However, "[a]n employer cannot avoid liability simply by showing it engaged in the interactive process in good faith." *Greene v. Bd. of Regents of Univ. Sys. of Ga.*, 742 F. Supp. 3d 1271, 1296 (N.D. Ga. 2024). "Instead, Defendant must show that Plaintiff's 'actions caused a breakdown in the interactive process.'" *Id.* (quoting *Stewart*, 117 F.3d at 1287).

Here, viewing the evidence in the light most favorable to Jones, Trustmark has shown that during the meeting between Teel, Smith, and Jones, Jones rescinded her request for a reasonable accommodation. Given her request to return without a reasonable accommodation, HR instructed her that a new certification showing the reasonable accommodation had been rescinded would be required.

Jones argues there is a genuine dispute of material fact as to the reasonable accommodation and claims Trustmark, not Jones, caused the breakdown in the interactive process. Doc. 37 at 31. Jones relies exclusively on "Teel's silence" and his response, "okay" to Jones when she said, "If it's going to be a problem with me being able to work from home, I can have my doctor just remove the accommodation." *Id.* at 32 (citing Doc. 31-4 at 71:1–5). Jones argues the dispute hinges on whether "okay" equates to Teel "agree[ing] that it was going to be a problem." *Id.* (citing Doc. 31-4 at 71:1–5). On this record, that is not a reasonable inference. "It is true that when considering a motion for summary judgment, 'the court must . . . make all reasonable inferences in favor of' the nonmoving party." *Miller v. Jefferson Cnty. Bd. of Educ.*, 2014 U.S. Dist. LEXIS 24220, at *14–15 (N.D. Ala. Feb. 26, 2014) (quoting *Chapman*, 229 F.3d at 1023). Such "an

21

inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but a pure conjecture and speculation." *Id.* (quoting *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982)). Jones contends Teel's 30-second silence prompted her to offer to remove the request, and his "okay" sealed the deal by indicating there would be a problem if she persisted with the accommodation request. Yet, Jones's argument requires the Court to accept her subjective impressions and speculation about the conversation on brief and disregard the words on the page of Jones's deposition transcript.

Even if the Court accepts Jones's explanation of the facts as true, Jones has not established Trustmark denied her reasonable accommodation claim. The record establishes at some point during the meeting with Smith and Teel, Jones rescinded her request to work from home. Doc. 31-4 at 70:2–72:9, 84:4–15; Doc. 31-23 ¶¶ 5–8. Jones's testimony agrees she initiated the conversation stating she could have her doctor remove the accommodation. Doc. 37 at 32 (citing Doc. 31-4 at 71:1–5). Trustmark and Jones's testimony agree in showing Jones initiated the removal of the accommodation. This fact is emphasized in that Jones's physician then submitted a new return-to-work form that did not include the hybrid work-from-home accommodation limitation. Doc. 31-17; Doc. 31-23 ¶¶ 7–8.

Because Trustmark established Jones rescinded her request during the interactive process and ultimately withdrew her request for accommodation altogether, Jones's claim that Trustmark failed to accommodate her must fail and summary judgment is due to be awarded on Jones's failure to accommodate claim.

22

### 3.  Jones's application to the Mortgage Loan Closing Specialist was not connected to her rescinded request for a reasonable accommodation.

In her response, Jones further argues Trustmark failed to accommodate her "when it did not reassign her to the position of Mortgage Loan Closing Specialist" because it was "available and fully remote." Doc. 37 at 33. Because Jones discussed with Teel her need for remote work on the same day she applied for this remote position, Jones argues she should have been reassigned to it as a reasonable accommodation for her disability. *Id.* Trustmark notes this argument is alleged for the first time in Jones's response.[14] Doc. 39 at 13. Nevertheless, Trustmark points out Jones "provided no evidence that she informed anyone at Trustmark that she was requesting a transfer to this position as an ADA accommodation," and the decision not to consider Jones for the position did not involve Teel; it was made solely by Sallie. *Id.*

"In the Eleventh Circuit, at the summary judgment stage, courts do not reach the question of whether the employer engaged in the interactive process unless and until the employee shows he requested a reasonable accommodation." *Laun*, 2019 U.S. Dist. LEXIS 164517, at *19–20 (citing *Spears v. Creel*, 607 F. App'x 943, 948 (11th Cir. 2015) (per curiam)).

At this stage, it is undisputed Jones submitted the job application on October 29, 2024, after the HR meeting with Teel and Smith in which Jones rescinded her reasonable

---

[14] "A plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013).

accommodation request. Jones introduces no evidence showing her application was made in connection to an accommodation request. In fact, the only evidence Jones presents that relates to her informing anyone of this request, was in the context of her performance review, in which she testifies she told Teel she would be applying to an internal remote position. Doc. 31-4 at 94:1–21. Nowhere in her testimony does she indicate how this application or conversation with Teel connects with her reasonable accommodation request that was rescinded three weeks prior.

Further, Trustmark presents evidence showing the individual responsible for reviewing applications for the position had no knowledge of Jones's earlier accommodation request. Doc. 31-19 ¶ 4. Finally, while Jones now cites to this job opportunity as a reasonable accommodation Trustmark was obligated to consider, "[t]he duty to make a reasonable accommodation does not simply spring from the fact that the [plaintiff] wants such an accommodation made." *Shwarz v. City of Treasure Isl.*, 544 F.3d 1201, 1219 (11th Cir. 2008) (quoting *Prindable v. Ass'n of Apt. Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003)).

Jones's new argument concerning the rejection of her application for this remote role does not create a dispute of material fact concerning whether she was denied an accommodation. Therefore, summary judgment is due to be granted for Trustmark on Count I.

**B.    Trustmark did not interfere with Jones's FMLA rights (Count V).**

Jones's FMLA interference claim is based on communications with Teel while she was on leave. Doc. 1 ¶ 88. Trustmark argues Jones cannot establish it interfered with her

24

FMLA rights when Teel communicated with Jones via text messages and a phone call while she was on leave. Doc. 32 at 15–17. Jones avers she was denied the benefit of her rights because (1) "Teel began calling her to ask when she would be returning to work and how her treatments were going . . . despite already being aware of her treatments and schedule[,]" and (2) when she returned to work, "she was stripped of her assignments and her work was reassigned to a coworker." Doc. 37 at 34–35.

"The FMLA provides that 'an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1204 (11th Cir. 2001) (citing 29 U.S.C. § 2612(a)(1) (1994)). "[T]he FMLA creates two types of claims: interference claims . . . and retaliation claims[.]" *Id.* at 1206. Interference claims are those "in which an employee asserts his employer denied or otherwise inferred with his substantive rights under the Act[.]" *Id.* (citing 29 U.S.C. § 2615(a)(1)). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Id.* at 1206–07.

### 1.    Teel's communications with Jones did not interfere with her FMLA rights.

Trustmark argues the text messages and call from Teel were "at most . . . a minor annoyance." Doc. 32 at 16. In response, Jones asserts her rights were infringed because "Teel began calling her to ask when she would be returning to work and how her treatments were going." Doc. 37 at 34.

25

To the extent Plaintiff is claiming that text messages and a short phone call were an interference with her FMLA, "[t]he law is clear that de minimis contacts from the employer while the employee is on leave does not give rise to a FMLA interference claim." Doc. 32 at 16–17 (citing *O'Donnell v. Passport Health Communications, Inc.*, 561 F. App'x 212, 218 (3rd Cir. 2014);[15] *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009)).[16] Further, "[t]he FMLA does not create an absolute right to be left alone." *See Simmons v. Indian Rivers Mental Health Ctr.*, 652 F. App'x 809, 819 (11th Cir. 2016) (per curiam) (affirming the district court's "finding that interference had not been established because [the plaintiff] received only occasional and brief telephone calls [and] . . . was not required to perform work during her FMLA leave[.]").

During her deposition, Jones could not provide further context about this situation or explain how she was denied an FMLA benefit through these text messages and phone call. Doc. 31-4 at 63:11–68:24; Doc. 31-26. In fact, Jones acknowledged that these communications "didn't inquire about anything. [Teel] just kept asking [her] to call him" and eventually they had a call to "inquir[e] into how [she was] doing and when [she] may be coming back to work." Doc. 31-4 at 63:20–22, 66:9–14.

Here, Jones's only allegations of interference include that her supervisor made a de minimis contact with her through text messages to schedule and eventually hold a phone

---

[15] 561 F. App'x 212, 217–18 (finding employer's "de minimis contacts" including communications regarding her status as an employee, signing documents, pending salary request, and "acknowledging she was on medical leave" "did not require [the employee] to perform work . . . and did not materially interfere with her leave.").

[16] 620 F. Supp. 2d 524, 537 ("[f]ielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights.").

call. On this record, Jones has not demonstrated these actions amount to interference with her FMLA rights, and Trustmark is due to be awarded summary judgment as to Count V.

### 2.    Jones has not established she was stripped of her assignments upon her return.

Jones argues when she returned from FMLA, "she was stripped of her assignments, and her work was reassigned to a coworker." Doc. 37 at 34. Jones further asserts Teel "admitted that he reassigned the bulk of the loans" to a different coworker. *Id.* at 35. To this end, Jones argues her FMLA rights were violated because she was not "reinstated to her former position." *Id.* Jones did not make this allegation in her Complaint; her only allegation in her Complaint concerning FMLA interference involved an allegation that "Defendant interfered with Ms. Jones's FMLA rights while she was on leave." Doc. 1 ¶ 88. She is attempting to amend her Complaint through her opposition to summary judgment. As noted above, "[a] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe*, 716 F.3d at 559. Nevertheless, Trustmark argues Jones has failed to point to any evidence supporting her claim. Doc. 39 at 14–15.

The only "evidence" Jones provides in support of her argument is her deposition testimony in which she claimed that Teel "told [her] that due to [her] appointments and things like that he was giving [her coworker] . . . the bulk of the loans that were coming through." Doc. 31-4 at 185:5–22. In opposition, Trustmark establishes Jones was given the same assignments when she returned from FMLA. Doc. 31-24 ¶ 4 (reporting the nCino data "produced by Trustmark in discovery to counsel for Jones . . . establishes that Teel,

27

Driver, and Kocher continued to follow the same practices regarding the assignment of loans to assistants after Jones's diagnosis in June 2024 that they followed prior to her diagnosis."). Further, Teel's testimony explains how Jones was given six of the seven loan assignments during the time of June, July, and October. Doc. 31-3 at 38:21–39:2, 40:13–16.

Jones does not respond to the data evidence showing this contrary explanation for her dispute with the amount of work she received. Thus, as Jones has not raised a genuine issue of material fact concerning her claim of FMLA interference, Trustmark is entitled to summary judgment for this claim in Count V.

> **C.     Jones has not established Trustmark constructively discharged her from employment (Counts II, III, IV).**

In Counts II, III, and IV, Jones alleges claims of discrimination and retaliation. Doc. 1. Specifically, Count II alleges discrimination in violation of the ADA (Doc. 1 ¶¶ 52–62); Count III alleges retaliation in violation of the ADA (*Id.* ¶¶ 63–69); and Count IV alleges retaliation in violation of the FMLA (*Id.* ¶¶ 70–79). Trustmark argues because "[t]he only adverse employment action that Jones alleges is constructive discharge," and because Jones cannot meet her burden in establishing Trustmark constructively discharged her, Jones's Counts II, III, and IV all fail as a matter of law. Doc. 32 at 10.

First, Trustmark argues Jones cannot meet the evidentiary standard to establish constructive discharge. *Id.* at 10–13. Trustmark notes in response to an interrogatory "seeking information regarding the evidence supporting [Jones's] allegations of constructive discharge," Jones described the contents of her resignation letter and the claim

that "Teel suggested that she should find a job that better suits her current medical conditions[.]" *Id.* at 11 (citing Doc. 1-1 at 12). Trustmark also addresses the allegations made in Jones's resignation letter. In response, Jones emphasizes her constructive discharge claim is comprised of (1) "having . . . her medically supported accommodation criticized"; (2) having her work reassigned; (3) learning that "her cancer [was] discussed in the office without her consent"; and (4) claiming her supervisor told her to find a work-from-home position. Doc. 37 at 13.

Next, Trustmark argues Jones cannot establish she properly gave Trustmark "notice of and opportunity to remedy her concerns before she resigned." Doc. 32 at 13. In response, Jones argues "constructive knowledge of harassment" forms the basis of her "notice" for her "intolerable working conditions." Doc. 37 at 26–27.

As explained below, summary judgment is due to be awarded to Trustmark on Counts II, III, and IV because Jones (1) cannot meet her burden for constructive discharge and (2) she did not provide Trustmark an opportunity to remedy her complaints before she resigned.

### 1.      Evidentiary burden for constructive discharge

Trustmark argues Jones cannot establish that "a reasonable person would have considered her working conditions at Trustmark to be intolerable." Doc. 32 at 11. Jones claims her evidence creates a genuine dispute of material fact on this question. Doc. 37 at 21.

"To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that, at the time of the adverse employment action, [s]he had a

29

disability, [s]he was a qualified individual, and [s]he was subjected to unlawful discrimination because of h[er] disability." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). Likewise, a prima facie case for a retaliation claim under the ADA and FMLA require plaintiff shows "(1) [s]he engaged in statutorily protected [conduct]; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Lapham v. Walgreen Co.*, 88 F.4th 879, 889 (11th Cir. 2023) (alterations in original) (quoting *McAlpin v. Town of Sneads*, 61 F.4th 916, 927 (11th Cir. 2023)); *see also Bosarge v. Mobile Area Water & Sewer Serv.*, 2022 U.S. App. LEXIS 2046, at *36–37 (11th Cir. Jan. 24, 2022) (describing these requirements in the context of the ADA). "[A]dverse employment actions include 'tangible employment actions,' which are those actions 'that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts[.]'" *Davis v. Legal Servs. Ala.., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (per curiam) (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam)). "A constructive discharge qualifies as an adverse employment action." *Menzie v. Ann Taylor Retail, Inc.*, 549 F. App'x 891, 894 (11th Cir. 2013) (per curiam) (citing *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000)).

"A '[c]onstructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1287 (M.D. Ala. 2011) (alteration in original) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)). "Whether an employee's working conditions were so intolerable is an objective question." *Id.* (citing

*Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1363 (11th Cir. 1994) ("A claim for constructive discharge requires the employee to demonstrate that the work environment and conditions were so unbearable that a reasonable person in that person's position would be compelled to resign.")). "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable." *Atkins v. Fulton Cnty.*, 420 F.3d 1293, 1302 (11th Cir. 2005)). It is the plaintiff's burden to make this showing. *Menzie*, 549 F. App'x at 894–95 (citing *Poole v. County Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)).

### a)      Interactions with coworkers and work reassigned

Jones claims after her diagnosis, she "started to feel isolated from her peers" and alleges certain coworkers stopped speaking to her and people were discussing her condition. Doc. 37 at 22–23. Jones also asserts when she returned from FMLA, she had fewer assignments than she had previously, and instead, her coworker received all her assignments. *Id.* at 25. Trustmark argues "these allegations are based solely on her subjective feelings and interpretations, speculation, and hearsay." Doc. 32 at 12.

"In evaluating constructive discharge claims, [courts] do not consider the plaintiff's subjective feelings. Instead, [they] employ an objective standard." *Moore v. San Carlos Park Fire Prot. & Rescue*, 808 F. App'x 789, 798 (11th Cir. 2020) (per curiam) (alterations in original) (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (per curiam)). Jones compares herself to the plaintiff in *Poole*, 129 F.3d 551, stating that "like [that] plaintiff . . . Jones was stripped of her responsibilities and isolated from her coworkers." Doc. 37 at 21–22, 26. In *Poole*, the plaintiff claiming constructive discharge

31

presented evidence showing she was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers[.]" 129 F.3d at 553. There, the Eleventh Circuit found that this evidence raised a "genuine issues of material fact . . . as to whether plaintiff was constructively discharged." *Id.*

In contrast to the evidence in *Poole*, Jones presents only subjective interpretations of neutral events that occurred in the workplace. For example, Jones's testimony links her interpretation that she "felt that [her two coworkers] had completely just stopped talking to me" to a comment from another coworker that those same coworkers were talking about her diagnosis. Doc. 31-4 at 57:16–58:13. Even if the coworker hearsay was admissible, nowhere does Jones bridge the logical gap between her subjective feelings and the fact that two coworkers discussed her diagnosis. Elsewhere, she cites two incidents in which two different coworkers shared stories directly with Jones about individuals they knew who were also facing diagnoses of cancer. *Id.* at 41:15–25, 191:4–192:21. Jones offers no objective evidence that these conversations with her coworkers show "that working conditions were 'so intolerable that a reasonable person in [her] position would have been compelled to resign.'" *Moore*, 808 F. App'x at 798.

Jones claims after her diagnosis, Teel stopped providing substantive assignments and instead gave her assignments to Jones's coworker. Doc. 37 at 10–11. Apart from her own testimony about her perceived workload, Jones cites no evidence supporting her allegation. *See id.* at 10, 25. Further, while Jones acknowledges Trustmark uses the nCino system to track loan files and specifically describes how "[t]he loan officer handling that application would decide which assistant the loan would be assigned to," *id.* at 10–11,

32

Jones offers no further explanation about the nCino data, which reflects her subjective belief about her assignments is unsupported, *id.*; Doc. 31-24 ¶ 4. According to Etheridge, the data "establishes that Teel, Driver, and Kocher continued to follow the same practices regarding the assignment of loans to assistants after Jones's diagnosis in June 2024 that they followed prior to her diagnosis." *Id.* ¶ 4.

Thus, although Trustmark has produced unrefuted evidence showing the unremarkable assignment practices of Jones's supervisors, even if Jones was receiving less work than usual, Jones presents no evidence showing how these circumstances would make her workplace "so intolerable" to the point that she was "compelled to resign." *Moore*, 808 F. App'x at 798.

### b)    Accommodation and remote position

Finally, Jones alleges Teel (1) criticized her accommodation and (2) told her to find a work-from-home position. Doc. 37 at 13. Trustmark argues Jones has failed to produce any evidence of criticism and Jones "seeks to blame Trustmark for her decision because Teel allegedly made [Jones] feel awkward when he paused for too long . . . before responding to her explanation as to why she needed the accommodation." Doc. 39 at 4–5.

Jones claims her "accommodation was criticized" by Teel in the October 4, 2024, meeting; however, the only evidence she cites to as "criticism" was a scenario where at most, Teel said "I wasn't aware that you needed accommodations" and then was silent for "30 seconds" when Jones then "asked if it would be a problem if she had an accommodation." Doc. 37 at 23–24. While Jones generously frames this encounter as "criticism," at the same time, she reveals that the only basis for defining it in this manner

33

is her subjective "fear that she would lose her job." *Id.* at 24. Nowhere does Jones indicate objective evidence supporting her interpretation of these events as criticism.

Further, Jones asserts that during her quarterly evaluation on October 29, 2024, she was asked, "Don't you think it would be better if you could find a job working remotely?" *Id.* at 25–26. Accepting Teel did ask her this question, Jones does not show how this isolated statement "compelled her to resign." *Moore*, 808 F. App'x at 798. In fact, the evidence shows that even if Teel did share this comment with her in the evaluation, Jones (1) had already applied to and interviewed for a fully remote position with Hancock *before* the evaluation, (Doc. 31-4 at 233:24–234:14; Doc. 31-18; Doc. 31-20), and (2) actually did apply to another fully remote position with Trustmark that same day (Doc. 31-4 at 95:3–17).

The evidence also shows even though Jones applied for a remote position with Trustmark, neither Teel nor the reviewer for the other position had access to each other's information. Doc. 31-19 ¶ 4. Jones asks the Court to accept her allegation that "nothing in the record rules out the reasonable inference that Teel or others were not involved in decisions affecting [Jones] or that [Trustmark] did not communicate the condition and protected leave to Sallie via access to an internal system or other methods of communication." Doc. 37 at 17–18. The evidence shows Sallie alone made the assessment, and the Court cannot speculate to draw an inference in Jones's favor that it is possible, despite the evidence, that the decision was informed by her FMLA or accommodation request. *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

34

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Jones has not shown how Teel's comments could be "so intolerable" to the point that she was "compelled to resign," *Moore*, 808 F. App'x at 798, when she was already seeking out employment at this time "mainly based on it being remote" and because she was "wanting a change." Doc. 31-4 at 252:18–22; Doc. 31-18 at 2.

Thus, for the above-stated reasons, summary judgment is due to be awarded to Trustmark on Counts II, III, and IV.

### 2.    Opportunity to remedy

Alternatively, Trustmark argues Jones cannot establish a constructive discharge claim "because she did not give Trustmark notice of and an opportunity to remedy her concerns before she resigned." Doc. 32 at 13. In opposition, Jones argues Trustmark can be deemed to have "constructive knowledge" of Jones's intolerable working conditions because "Teel was so 'inextricably intertwined' in the intolerable environment." Doc. 37 at 26–27 (citing *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 490 (11th Cir. 1996)).

"A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Davis*, 19 F.4th at 1268 (quoting *Kilgore v. Thompson & Brock Mgmt.*, 93 F.3d 752, 754 (11th Cir. 1996)). "An employee has a duty to act reasonably before choosing to resign, and he must first notify his employer of the intolerable conditions and afford the employer an opportunity to correct them." *Champagne v. Jacksonville State Univ.*, 2011 U.S. Dist. LEXIS 168275, at *42 (N.D. Ala.

35

June 24, 2011) (citing *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)).

Jones acknowledged she did not report any of the conduct comprising the alleged constructive discharge to Trustmark. Doc. 31-4 at 211:7–213:16. Instead, Jones relies on *Splunge* to argue that constructive discharge can be established by showing "the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." Doc. 37 at 26 (quoting *Splunge*, 97 F.3d at 490).

This argument requires the Court accept her claim that the "intolerable working conditions" comprising the "constructive knowledge" were that Teel (1) "coerced Jones into revoking her request for accommodation," (2) "shared her diagnosis with multiple people who had no involvement," (3) "called her into his office for discussions about how an employee's sister had worked through her cancer diagnosis," and (4) "hinted repeatedly at threats to her job security." *Id.* at 27. In Section IV.D.1, the Court found these claims were based in Jones's subjective interpretation of events and not objective evidence in the record. The Court finds no reason to rehash these allegations. Fundamentally, a claim of constructive discharge cannot rest on subjective interpretations of events, *Hipp*, 252 F.3d at 1231 (finding that "[courts] do not consider the plaintiff's subjective feelings. Instead, [they] employ an objective standard."), and the "intolerable working conditions" in this context also cannot rest on such subjectivity. *Phillips v. Harbor Venice Mgmt., LLC*, 2020 U.S. Dist. LEXIS 91011, at *13 (M.D. Fla. May 26, 2020) ("[W]hether the working conditions were sufficiently intolerable to amount to a constructive discharge is judged by

36

an objective standard, not the employee's subjective feelings."); *see Menzie*, 549 F. App'x at 895 (describing how "[t]his objective standard sets a high threshold.").[17]

The record is bereft of evidence showing how Jones fulfilled the duty to act reasonably before choosing to resign. *See Champagne*, 2011 U.S. Dist. LEXIS 168275, at *42. Jones decided to resign from her position with no prior notice to her employer. Doc. 31-3 at 98:6–18; Doc. 31-4 at 211:7–212:3; Doc. 31-1 at 2; Doc. 31-21. Jones presents no evidence showing how her employer was provided notice of the alleged intolerable work conditions. Thus, for the additional reason that Jones did not provide Trustmark the opportunity to remedy the alleged intolerable working environment, summary judgment is due to be awarded Trustmark on Counts II, III, and IV.

---

[17] Moreover, Jones's reliance on *Splunge* for the principle of "constructive knowledge" is misplaced; that case involved a hostile work environment claim. *Splunge*, 97 F.3d at 490 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982)) ("[t]he employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge."). In hostile work environment claims, like the claim in *Splunge*, constructive knowledge presents an alternative method of establishing an employer's knowledge by inference. *Henson*, 682 F.2d at 905. Jones's argument attempts to shoehorn the "constructive knowledge" element of hostile work environment claims into the intolerable working conditions element of the constructive discharge claim. *Freeman*, 777 F. Supp. 2d at 1287. Nowhere does Jones present legal authority allowing the court to use the constructive knowledge element to establish the requisite intolerable working conditions necessary for a constructive discharge claim. Notably, "[i]t is more difficult to make out a claim for constructive discharge than one for a hostile work environment." *Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180, 1199 (N.D. Ala. 2019).

## V.    CONCLUSION

For the reasons stated above, it is ORDERED that Trustmark's Motion for Summary Judgment (Doc. 31) is GRANTED. A separate judgment will issue.

DONE this 1st day of June, 2026.

KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

38